WILLIAM L. PALMER and LEATRICE J. PALMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Palmer v. Commissioner
Docket No. 3792-74.
United States Tax Court
T.C. Memo 1976-210; 1976 Tax Ct. Memo LEXIS 193; 35 T.C.M. (CCH) 908; T.C.M. (RIA) 760210; June 29, 1976, Filed Dale A. Dossey, for the petitioners. William T. Overton, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of petitioners William L. and Leatrice J. Palmer for the calendar years 1969 and 1970 in the amounts of $8,996 and $15,277, respectively. Some of the issues raised by the pleadings have been disposed of by agreement *194 of the parties leaving for our decision (1) the extent to which the gross income reported on petitioners' Federal tax return was understated for each of the years 1969 and 1970; (2) whether Mrs. Palmer is entitled to be relieved from liability under the provisions of section 6013(e), I.R.C. 1954, [1] for any deficiency in income tax resulting from an understatement of the gross income reported on the joint returns she filed with her husband for 1969 and 1970; [2] and (3) whether petitioners are entitled in 1969 to deduct business automobile expense in excess of $500. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of their petition in this case, William L. and Leatrice J. Palmer resided in Houston, Texas. Petitioners filed joint Federal income tax returns for the calendar years 1969 and 1970 *195 with the Director, Internal Revenue Service Center, at Austin, Texas on the cash receipts and disbursements method of accounting. The Palmers were married in 1958. They have two children, one of whom, Kimberly, was 3 years old in 1969. Beginning sometime in 1969 Mr. Palmer operated a mail order business. Prior to that time he had not had a steady job from the date the Palmers were married except for two jobs that had a duration of approximately 1 year each with the most recent extending into 1969 when he worked as a salesman. The mail order business was operated under several different names. The business activity primarily involved the sale of forms for last wills and testaments. During the years 1969 and 1970 Mrs. Palmer was employed as a pharmacist on a full-time basis. In addition on her days off she often worked for another pharmacy. In her full-time job she was paid on the fifteenth and last day of the month. For the year 1969 she earned a total of $11,813 and for 1970 earned a total of $10,938, consisting of $9,188 from her full-time work and $1,750 from her part-time work. All of the income earned by Mrs. Palmer was properly reported on the Palmers' joint Federal *196 income tax returns filed for 1969 and 1970. Mr. Palmer maintained a number of bank accounts in 1969 and 1970 with respect to his mail order business. Some of these accounts were under assumed names. For the years in issue the following total deposits were made to accounts of Mr. Palmer in the names indicated: Total Amount of Deposits Bank
Name of Account
1969
1970
Hallmark and Co.
Edgewater National
with signature
$ 2,507.81 $0
Bank
R. E. Hallmark
First National Bank
National Association
12,987.14
120.85
of Bellaire
of Manufacturers
Representatives
First National Bank
Gibralter Will Form
0
15,633.70
of Bellaire
Co.
Gulf Coast National
Legal Forms, Inc.
0
22,456.36
Bank
Meyerland State Bank
National Will Forms
5,770.77
0
Meyerland State Bank
American Will Forms
0
13,206.14
Missouri City State
Gibralter Will Form
3,332.84
0
Bank
Co.
Missouri City State
Bill Palmer
2,060.48
0
Bank
Missouri City State
American Association
Bank
of Manufacturers
Representatives
0
480.00
Sharpstown State
State Will Form Co.
2,992.25
0
Bank
$29,651.29
$51,897.05
Deposits to each of these accounts *197 were numerous, while the account was active. In the case of the accounts at Meyerland State Bank, the Gibralter Will Form Co. account at Missouri City State Bank, the account at Sharpstown State Bank, and the Legal Forms, Inc. account at Gulf Coast National Bank deposits were made almost on a daily basis. Mr. Palmer had no formal education. He has had mental problems for a number of years. In the early part of 1969, he began psychotherapy treatment and has been hospitalized approximately 30 times as a result of his mental problems. In 1969 he was hospitalized for a total of three or four months. Mr. Palmer conducted his business activities from a location other than his home. He had employees who continued the everyday operation of the business, such as picking up the mail and making deposits in the various bank accounts while he was hospitalized. The receipt of mail was at a post office box controlled by Mr. Palmer. Mrs. Palmer had no contact with the business. She was not authorized to sign checks on the bank accounts maintained by Mr. Palmer. She never picked up his mail nor did she make any deposits to his business accounts. Mrs. Palmer maintained a checking account *198 in her name. She had opened this account at age 18 when she began college. At no time has Mr. Palmer been authorized to write checks on this account. This account was used by Mrs. Palmer to pay household bills and her personal expenses. Total deposits made to this account, at Citizens State Bank, Somerville, Texas, during the years 1969 and 1970 were $19,832.78 and $24,976.92, respectively. The following amounts were deposited to Mrs. Palmer's account at Citizens State Bank, Somerville, Texas, during the taxable year 1969 on the dates indicated: Date
Amount
1/03/69
$ 349.50
1/10/69
336.00
1/18/69
330.32
1/22/69
400.00
1/31/69
782.48
2/05/69
650.00
2/19/69
330.32
2/24/69
650.00
3/0 1/69
886.53
3/18/69
530.32
4/02/69
346.00
4/08/69
160.00
4/14/69
593.47
5/02/69
659.40
5/20/69
480.32
5/27/69
20 0.00
6/04/69
646.00
6/10/69
730.72
6/20/69
150.00
6/28/69
160.00
7/01/69
350.00
7/01/69
346.00
7/08/69
75.00
7/16 /69
680.32
7/23/69
75.00
8/01/69
696.00
8/12/69
100.00
8/18/69
350.00
8/19/69
356.12
8/20/69
.48
8/30/69
1,092.0 0
9/19/69
680.32
9/22/69
320.00
10/15/69
699.60
10/22/69
701.32
11/05/69
716.60
11/18/69
351.32
11/24/69
525.00
12/02/69
967.00
12/16/69
931.32
12/22/69
448.00
$19,832.78
*199 During the taxable year 1970, the following amounts were deposited to Mrs. Palmer's account at Citizens State Bank on the dates indicated: Date
Amount
1/02/70
$ 701.50
1/15/70
335.52
1/26/70
300.00
1/28/70
700.00
2/08/70
701.20
2/13/70
783.00
3/04/70
901.20
3/09/70
150.00
3/1 7/70
783.00
4/03/70
681.20
4/17/70
783.00
4/20/70
500.00
4/28/70
801.20
5/15/70
783.00
5/19/70
195.00
6/09/70
90 1.20
6/16/70
1,101.00
7/03/70
878.00
7/13/70
38.80
7/22/70
336.40
8/04/70
554.60
8/07/70
300.00
8/07/70
200.00
8/ 13/70
786.40
9/01/70
954.60
9/08/70
450.00
9/15/70
3,996.90
9/18/70
636.40
10/01/70
1,108.20
10/19/70
707.40
10/29/70
100.00
11/02/70
825.60
11/23/70
686.40
11/30/70
679.80
12/16/70
636.40
$24,976.92
Part of the deposits were from pay checks Mrs. Palmer received from her full-time position as a pharmacist. Mrs. Palmer also maintained an account at Southwestern Savings Association of Houston, Texas, in the name of "Leatrice Palmer, Trustee for Kimberly." During the first half of 1969, five deposits totaling $1,658.21 were made to this account in amounts ranging from $100 to $650. Part of the *200 deposits to this account were from money earned by Mrs. Palmer in her part-time job. As far as Mrs. Palmer knows, she was the only individual to make deposits to this account. Mr. Palmer did not live at the Palmers' home continuously during 1969 and 1970. In addition to being hospitalized several times for treatment of his mental problems, Mr. Palmer made several trips to Las Vegas and one trip to Los Angeles during these years. Mr. Palmer did not separately pay household bills. All household expenses were paid by Mrs. Palmer by checks drawn on her account at Citizens State Bank. Mrs. Palmer received a number of checks from Mr. Palmer drawn on his various checking accounts. Most of these checks were deposited to her account at Citizens State Bank. In addition Mr. Palmer made some deposits directly to her account at Citizens State Bank. During 1969 checks totaling $5,450 in amounts ranging from $75 to $600 per check were received by Mrs. Palmer from Mr. Palmer and deposited in her account at Citizens State Bank or were deposited directly in her account by Mr. Palmer. Mrs. Palmer received three other checks from Mr. Palmer in 1969 made payable to her in the amount of $100 *201 each which she cashed at the pharmacy where she was employed. The checks Mrs. Palmer received in 1969 were drawn on accounts entitled Gibralter Will Form Co., National Association of Manufacturers Representatives, Bill Palmer, and Hallmark & Co. Hallmark & Co. checks were drawn on two different accounts at the Edgewater National Bank of Edgewater, New Jersey. The checks were signed with the name of R. E. Hallmark, but the handwriting was that of Mr. Palmer. [3] Mrs. Palmer received some of these checks during the period Mr. Palmer was confined in a mental hospital. The checks she received during these periods were received by her through the mail or delivered to her by Mr. Palmer's mother. *202 During 1969 the Palmers acquired several items for their house or other personal use. These items included a deep freeze, two color television sets, carpeting, and a Buick automobile. In 1970 petitioners acquired a new Cadillac automobile, which was considered Mrs. Palmer's car, a boat and living room and dining room furniture. To some extent these items were financed. Mrs. Palmer was required to sign the installment loan agreement on items financed because information with respect to Mr. Palmer on file in local credit bureaus, including information as to his mental illness, prevented him from obtaining credit solely in his own name. Beginning in late 1969 Mrs. Palmer questioned Mr. Palmer about his business activities. She questioned him as to the source of funds he was spending on trips to Las Vegas and other activities which Mrs. Palmer thought indicated that he was not living within his income. Mr. Palmer told her he was selling will forms, but she did not learn anything further about the business other than the fact that he maintained a number of business bank accounts which she learned only from receiving checks from Mr. Palmer drawn on these accounts. Mrs. Palmer *203 inquired several times as to her husband's business activities but did not receive responses which she considered a satisfactory explanation. She did not pursue her inquiries further since she was of the opinion that Mr. Palmer's mental problems would prevent his making a true and complete explanation of his activities. The Palmers' Federal income tax returns for 1969 and 1970 were prepared by an accounting or bookkeeping service retained by Mr. Palmer. After the 1969 return was prepared from information which Mrs. Palmer believed to have been supplied by Mr. Palmer, Mrs. Palmer went to the home or office of the tax return preparer and signed the return. At one point during the years in issue Mrs. Palmer became concerned whether Mr. Palmer had filed an estimated tax return. She called the accountant and was assured that this return was filed and that quarterly payments were being made. In the Palmers' Federal income tax return for 1969 on Schedule C, gross receipts of the mail order business were stated to be $15,757. Expenses totaling $5,874 were deducted, leaving a reported net profit from Mr. Palmer's business of $9,883. This amount, along with Mrs. Palmer's wages of *204 $11,813 and miscellaneous income of $180, resulted in a total adjusted gross income reported of $21,876. In the Palmers' Federal income tax return for 1970 on Schedule C, gross receipts of a mail order business said to be operating under the name of Union Publishing Co. were reported to be $28,642. Expenses totaling $20,678 were deducted, leaving a reported net profit of $7,964. This amount, along with Mrs. Palmer's wages of $10,938, composed the total adjusted gross income of $18,902 reported on the Palmers' 1970 income tax return. Respondent, in his notice of deficiency, increased petitioners' reported gross income in 1969 and 1970 by amounts of $20,689 and $38,564, respectively, computed as follows: Schedule of Deposits
1969
1970
Total
Net
Total
Net
Deposit
Adjustments
Deposit
Deposit
Adjustments
Deposit
Citizens State Bank:
$19,832.78 $ $
$24,976.92 $
$24,976.92
Insurance proceeds
540.53
Transfers from other accts.
5,300.00
Salaries
* 8,830.17
Certificate of Deposit
25.80
5,136.28
Edgewater National Bank: R. E. Hallmark
2,507.81
2,507.81
First Nat'l Bk of Bellaire: Nat'l Assn. of Mfg. Rep.
12,987.14
12,987.14
120.85
120.85
Gibraltar Will Form Co.
15,633.70
Debit to sales
206.00
15,427.70
Gulf Coast Nat'l Bank: Legal Forms, Inc.
22,456.36
Debit to sales
4.98
22,451.38
Meyerland State Bank: National Will Forms
5,770.77
5,770.77
American Will Forms
13,206.14
13,206.14
Missouri City State Bank: Gibraltar Will Form Co.
3,332.84
3,332.84
Bill Palmer A/C
2,060.48
2,060.48
American Assn. Mfg. Reps.
480.00
480.00
Sharpstown State Bank: State Will Form Co.
2,992.25
2,992.25
Southwestern Savings Assn.: Leatrice Palmer, Trustee
for Kimberly
1,658.21
1,658.21
Subtotals
$51,142.28
$14,696.50
$36,445.78
$76,873.97
$ 210.98
$76,662.99
Less: Reported Schedule "C" Receipts
15,757.00
28,642.00
Net Salaries
*
9,456.70
TOTAL other adjustments
$15,757.00
$38,098.70
Net Bank deposits in excess of reported receipts
$20,688.78
$38,564.29
**
**
*205 Respondent explained that his determination of petitioners' taxable income was based on an analysis of bank accounts because of the absence of adequate records of petitioners' income. Respondent disallowed $1,000 of the $1,500 claimed by petitioners as a deduction in 1969 for "mileage expense" for lack of substantiation. OPINION Petitioners at the trial and on brief admitted that no records with respect to Mr. Palmer's business activities were available and therefore respondent was justified in constructing petitioners' gross income by reference to bank deposits made by petitioners. However, they argue that respondent did not make sufficient adjustments for transfers from bank accounts of Mr. Palmer to Mrs. Palmer's account and for a $1,000 loan made by Mrs. Palmer to Mr. Palmer. Petitioners contend that all deposits made to Mrs. Palmer's account at Citizens State Bank were either of her reported salary or transfers from accounts of Mr. Palmer. Petitioners also contend that the deposits to the account which Mrs. Palmer had as trustee for Kimberly were from her reported salary or transfers from other accounts of Mr. Palmer's *206 which respondent had considered as income. The burden of proof is on petitioners to show what portions of the total deposits were from a source which would not constitute taxable income and what deductions, if any, they are entitled to take. William O'Dwyer,28 T.C. 698 (1957), affirmed 266 F. 2d 575 (4th Cir. 1959), certiorari denied 361 U.S. 862 (1959). Respondent in his computation of gross income for 1969 reduced total deposits by the amount of $15,757 of gross receipts shown on Schedule C of petitioners' return, the amount of $8,800 representing Mrs. Palmer's net salary after payroll deductions, [5] and an amount of $5,300 representing amounts transferred from bank accounts of Mr. Palmer to Mrs. Palmer's account. Petitioners have produced 21 checks drawn on accounts maintained by Mr. Palmer covering a period of May 27, 1969 to December 15, 1969. *207 The total amount of $5,450 of these checks was deposited into Mrs. Palmer's account. The record is not clear that all of these checks were drawn on accounts of Mr. Palmer which were included in computing petitioners' gross income. The indication from the record is to the contrary. However, since respondent's allowance of $5,300 of adjustment to eliminate duplication was apparently based on these checks, we conclude that the adjustment for 1969 to account for duplication should be $5,450 rather than the $5,300 determined by respondent. No documentary evidence of any nature was presented to show a duplication in gross income of amounts deposited in Mrs. Palmer's account in 1969 other than the $5,450 of checks and no documentary evidence of duplication was presented for the year 1970. We have considered Mrs. Palmer's testimony that she thought all deposits to her account other than her salary came from bank accounts of Mr. Palmer which respondent had included in petitioners' income, but we have found it unpersuasive. Mrs. Palmer testified that Mr. Palmer made no deposits directly to her account but the few checks transferring funds which were produced showed that he in fact did. *208 Also, the checks produced included some checks which appeared to be on a bank account, deposits to which had not been included by respondent in computing petitioners' income. The record shows that Mr. Palmer let certain bank accounts become inactive and opened others sometimes in the same assumed name on a number of occasions. Mrs. Palmer stated that she thought Mr. Palmer made these changes in bank accounts because the State Bar Association was investigating him for the illegal practice of law. Whatever the reason, the facts here are insufficient to show that the deposits in Mrs. Palmer's account came from accounts of Mr. Palmer, deposits to which were included by respondent in computing petitioners' income except to the extent of $5,450 in 1969. Petitioners gave no explanation of why they were able to produce certain checks drawn by Mr. Palmer to Mrs. Palmer or deposited to her account and not able to produce other checks. One explanation might be that any other checks drawn by Mr. Palmer to Mrs. Palmer or deposited to her account were on banks from which no deposits were included in respondent's computation. In reaching the amount of understated income for 1970 respondent *209 made two samall adjustments, one of $206 and one of $4.98, to bank deposits and subtracted Mrs. Palmer's net salary and the amount of gross receipts reported by Mr. Palmer on Schedule C of their joint return from the total amount of deposits to arrive at petitioners' understatement of income. No adjustment was made for transfer from one account to another. For reasons heretofore stated we conclude that petitioners have failed to show error in respondent's determination of understatement of income in 1970. Petitioners argued that the gross income computed by respondent should be reduced by the amount of $1,000 which Mrs. Palmer lent to Mr. Palmer in 1969.Petitioners have offered no evidence to show that Mr. Palmer deposited the $1,000 in any bank account deposits to which were included in respondent's computation. In fact, no showing is made of what happened to the proceeds of the $1,000 loan. Petitioners have failed to show that respondent erred in not reducing his computation of the understatement of income by this $1,000. Petitioners contend that the deposits to the account Mrs. Palmer maintained as trustee for Kimberly should not be included in the computation of petitioners' *210 income. This contention is without merit. To the extent these deposits came from Mrs. Palmer's wages an adjustment has been made since the bank deposits in each year have been reduced by her total net wages. To the extent the deposits came from any other source petitioners have failed to show that they did not represent income. Mrs. Palmer argues that she should be relieved of liability under the provisions of section 6013(e) for any deficiency in income tax occasioned by the understatement of gross income. [6] Under this section, in order to be relieved from liability as an "innocent spouse" Mrs. Palmer must show that the three conditions required by the section have been met. Jerome J. Sonnenborn,57 T.C. 373 (1971). The parties are in agreement that the requirements of subparagraph (A) have been met. *211 Mrs. Palmer argues she has also met the other requirements of section 6013(e). In support of this position she argues she was generally unaware of her husband's business activities in 1969 and 1970, that she questioned him about the nature of his business, but never received satisfactory answers because of his erratic behavior and his mental problems. She checked with the bookkeeper hired by Mr. Palmer and was assured that estimated tax returns were being filed. She stated that she signed the 1969 income tax return prepared by the bookkeeper at his place of business without having the opportunity to review the prepared return. From these facts she maintains she did not know or have reason to know of the omissions from gross income. Respondent takes the position that Mrs. Palmer knew or had reason to know that her husband's gross income was not being properly reflected on the joint returns they filed. Respondent argues that the facts show that Mrs. Palmer had every reason to know of the understatement of income since (1) she knew that her husband was operating a mail order business under a number of names and that gross receipts from this business were channelled through numerous *212 bank accounts; (2) she received checks from her husband drawn on at least four different bank accounts with two accounts bearing a signature, in her husband's handwriting, of a fictitious individual; and (3) the standard of living of the family was such that Mrs. Palmer had reason to know the funds were not coming from petitioners' reported income. We agree with respondent. The facts show that if Mrs. Palmer did not know of the unreported income she reasonably should have known of the omission. The checks drawn on various accounts which Mrs. Palmer received and the unexplained deposits made to her account should have alerted her to look into the source of the funds. In addition to Mrs. Palmer's wages reported in the return filed for 1969 there was reported as profit from the mail order business $9,883.However, the total of the unexplained deposits to her account which presumably came from the husband's business and checks she received from her husband are in excess of $11,000.In addition to Mrs. Palmer's wages reported in the return for 1970 there was reported profit from the mail order business of $7,964. However, unexplained deposits to the account she maintained were in excess *213 of $15,500. In addition Mrs. Palmer was aware that her husband made several trips to Las Vegas and one trip to Los Angeles which caused her to be concerned that he was not living within his income. Obviously an examination of the tax returns for 1969 and 1970 would have disclosed to Mrs. Palmer that there had been placed in her bank account as receipts from or deposits by Mr. Palmer more than the total income Mr. Palmer reported on the returns. Any reasonable person would be alerted by this situation to the fact that income was omitted from the returns. Mrs. Palmer stated that she did not have the opportunity to examine the income tax returns. However, no reason has been shown why she did not have the opportunity to examine the returns. Certainly she could have examined the returns when she went by the preparer's office to sign them. In fact it was her responsibility to examine the returns to see that they were accurate before she signed them. Merely a glance at the reported income on the returns would have made Mrs. Palmer aware of the omission of income. Mrs. Palmer is an educated and intelligent woman. Unquestionably she had problems in 1969 and 1970 in dealing with *214 a mentally ill husband. However, this is not the basis for granting the relief provided for in section 6013(e). Mrs. Palmer had reason to know of the omission of income from the joint returns and therefore does not meet the requirements of the statute. The returns preparer was not called as a witness. If Mrs. Palmer had looked at the returns and told him what she reasonably must have known, that she had received more money from Mr. Palmer than his reported income, the preparer would have been alerted to obtain additional records from Mr. Palmer. Mrs. Palmer has also failed to show that she meets the requirements of subparagraph (C) of section 6013(e)(1). From an examination of the facts present it is clear that Mrs. Palmer benefited directly or indirectly from the items omitted from gross income. The Palmers during the years in issue purchased a number of relatively expensive items. The purchase of a new Cadillac and a Buick automobile, two color television sets, a boat, a deep freeze, living room and dining room furniture, and carpeting would be most difficult on the amount of income disclosed in the returns, even assuming these items were purchased to some extent on installment *215 plans. The Cadillac was used by Mrs. Palmer as "her car." The items purchased, such as a Cadillac and a boat, exceed "normal support." See section 1.6013-5(b), Income Tax Regs. Also, although apparently Mr. Palmer is now under a prison sentence and confined to the prison mental hospital, he and Mrs. Palmer are still married. There is nothing in this record, however, to show that much of the money he made that petitioners failed to report on their income tax returns for 1969 and 1970 is not still on deposit in various banks and will not in later years benefit Mrs. Palmer. Under all the circumstances here present it is not inequitable to hold Mrs. Palmer liable for the tax attributable to the omissions from gross income. On their return for 1969 petitioners claimed a deduction for "mileage expenses" in the amount of $1,500. Apparently the claimed deduction was in connection with Mr. Palmer's mail order business. In the statutory notice of deficiency respondent determined that $1,000 of the claimed deduction was not allowable because of lack of substantiation. Petitioners have failed to offer any evidence with respect to this deduction. Therefore the determination in the notice *216 of deficiency is sustained. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩
2. Concessions have been made by petitioners with respect to certain items of deduction disallowed by respondent. The parties are in agreement that any deficiency arising from disallowed deductions is not within the scope of sec. 6013(e)↩.
3. From May 27, 1969 thru December 15, 1969, Mrs. Palmer received the following amounts drawn on the following accounts of Mr. Palmer's: No. of Checks
Account Name
Amount
1
Gibralter Will Form Co.
$ 175
12
National Association of Manufacturers
3,075
Representatives
2
Bill Palmer
450
4
Hallmark & Co.
1,580
5
Hallmark & Co.
470
24
$5,750 All of these checks, but two, were made payable to Mrs. Palmer, endorsed by her and cashed or deposited to her account. On one check Mr. Palmer wrote Mrs. Palmer's signature as endorsement and deposited it in her account. On one check the payee was William Palmer. Mr. Palmer endorsed this check and deposited it to Mrs. Palmer's account. Checks were drawn on two accounts of Hallmark & Co. Those drawn from July 1969 through September 1969 were on one account and those drawn in November and December 1969 on the other account. The $2,507.81 of deposits made to the Hallmark & Co. account were made from June 16 through August 27, 1969.↩
*. Adjusted above ↩
**. Rounded to even dollars↩
5. Mrs. Palmer's wages for 1969 totaled $11,813. Deductions from this amount in reaching the amount she would have actually deposited include Federal income tax withholding and Social Security. From information appearing on the return the computation of net pay deposited is proper.↩
6. Section 6013(e) provides as follows: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In general. Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special rules.--For purposes of paragraph (1)-- (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).↩